BK1004794
SAB

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

| | |
|---|---|
| IN RE: | Case No. 10-21301 |
| Virginia T Boyd-Stephens | Chapter 7 |
| Debtor | Judge Wise |
| | **MOTION OF THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION FKA THE BANK OF NEW YORK TRUST COMPANY, N.A. AS SUCCESSOR TO JPMORGAN CHASE BANK N.A. AS TRUSTEE BY AND THROUGH GMAC MORTGAGE, LLC ITS SERVICER FOR RELIEF FROM THE AUTOMATIC STAY AND FOR ABANDONMENT (PROPERTY LOCATED AT 53 SYLVAN DRIVE, INDEPENDENCE, KY 41051)** |

The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee by and through GMAC Mortgage, LLC its servicer (the "Movant") moves this Court, under §§ 361, 362, 363, 554 and other sections of the Bankruptcy Reform Act of 1978, as amended (the "Bankruptcy Code") and under Rules 4001, 6007 and other rules of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an Order conditioning, modifying or dissolving the automatic stay imposed by § 362 of the Bankruptcy Code and for abandonment of property under § 554 of the Bankruptcy Code. In support of this Motion, the Movant states:

1

## MEMORANDUM IN SUPPORT

1    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core

proceeding under 28 U.S.C. § 157(b)(2). The venue of this case and this Motion is proper under 28

U.S.C. §§ 1408 and 1409.

2    On March 24, 2006, the debtor listed above obtained a loan from The MoneyStation, Inc. in the

amount of $147,000.00. Such loan was evidenced by a promissory note dated March 24, 2006, (the

"Note").

3    To secure payment of the Note and performance of the other terms contained in it, the debtor

executed a Mortgage dated March 24, 2006 (the "Security Agreement"). The Security Agreement

granted a lien on the real and/or personal property (the "Collateral") owned by the debtor, located at 53

Sylvan Drive, Independence, KY 41051 and more fully described in the Security Agreement.

4    The lien created by the Security Agreement was duly perfected by the filing of the Security

Agreement in the Office of the Kenton County Clerk on April 10, 2006. The lien is the First lien on the

Collateral.

5    The Note and Security Agreement were transferred as follows:

The Note was transferred from The MoneyStation, Inc. to Residential Funding Corporation as

evidenced by the Allonge on the Note.

The Note was transferred from Residential Funding Corporation to JP Morgan Chase bank, as Trustee

as evidenced by the Endorsement on the Note.

The Note was transferred from JP Morgan Chase bank, as Trustee to The Bank of New York Mellon

Trust Company, National Association fka The Bank of New York Trust Company, N.A as successor to

JPMorgan Chase Bank N.A. as Trustee as evidenced by the Allonge on the Note.

The Mortgage was transferred from Mortgage Electronic Registration Systems, Inc. as nominee for The

MoneyStation, Inc. its successors and assigns to The Bank of New York Mellon Trust Company,

National Association fka The Bank of New York Trust Company, N.A as successor to JPMorgan Chase

Bank N.A. as Trustee as evidenced by the assignment recorded on June 9, 2010.

On July 1, 2008, a change of Corporate Title from The Bank of New York Trust Company, National

Association to The Bank of New York Mellon Trust Company, National Association was sent to the

Office of Thrift Supervision as is evidenced by the document attached to this Motion as Exhibit "D".

    6  The value of the Collateral is $100,000.00. This valuation is based on the Debtor's Schedules.

    7  Debtor claimed an exemption in the property of $0.00.

    8  As of the date of this Motion, there is currently due and owing on the Note the outstanding

balance of $143,956.18, plus interest accruing thereon at the rate of 4.75% per annum ($18.54 per day)

from July 20, 2010.

        9  Other parties who may have an interest in the Collateral are: N/A.

10 The Movant is entitled to relief from the automatic stay under §§ 362(d)(1) and/or 362(d)(2) for

these reasons:

           This case is a Chapter 7 wherein debtor is in default for payment on the mortgage loan

and there is no equity for the benefit of the estate.

11 Movant has attached as  "A", a copy of the proof of claim filed in this case by Movant, along with

copies of the supporting documents establishing the Movant's perfected security interest in the above

described collateral.

WHEREFORE, Movant prays that the automatic stay imposed by 11 U.S.C. § 362 be terminated in all respects as against said Movant, and its successors and assigns; and that the Trustee's interest be abandoned pursuant to 11 U.S.C. § 554, Bankruptcy Rule 6007(b) and E.D.Ky. LBR 4001-1.

/s/ Rachel K. Pearson
Rachel K. Pearson
KY Bar Registration #91184
(513) 241-3100 x-3309

LERNER, SAMPSON & ROTHFUSS
Attorneys for Movant
PO Box 5480
Cincinnati, OH 45201-5480
(513) 354-6464 fax
ckybk@lsrlaw.com

## <u>NOTICE AND OPPORTUNITY FOR HEARING</u>

The undersigned certifies that a copy of the foregoing Motion for Relief from the Automatic Stay and for Abandonment of Property of the secured creditor, The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee by and through GMAC Mortgage, LLC its servicer, was electronically transmitted on July 20, 2010 via the Court's CM/ECF system to the following who are listed on the Court's Electronic Mail Notice list. Unless within fifteen (15) days from the date hereof a written responsive objection to the Motion is filed with the Court and served on the undersigned, an order sustaining the Motion may be entered by the Court.

A hearing will be held only in the event a written responsive objection is timely filed and served.

Hon. Alexander F Edmondson
28 W 5th St
Covington, KY 41011
aedmondson@edmondsonlaw.org

Michael L. Baker, Trustee
541 Buttermilk Pike #500
P.O. Box 175710
Covington, KY 41017-5710
trusteemlb@zslaw.com

Office of the U.S. Trustee
100 East Vine Street, Ste. 500
Lexington, KY 40507
ustpregion08.lx.ecf@usdoj.gov

1

The undersigned certifies that a copy of the foregoing Motion for Relief from the Automatic Stay and for Abandonment of Property of the secured creditor, The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee by and through GMAC Mortgage, LLC its servicer, was transmitted on July 20, 2010 via regular U.S. mail, postage pre-paid:

Virginia T Boyd-Stephens
6447 Adahi Drive
Independence, KY 41051

/s/ Rachel K. Pearson
Rachel K. Pearson
KY Bar Registration #91184
(513) 241-3100 x-3309

LERNER, SAMPSON & ROTHFUSS
PO Box 5480
Cincinnati, OH 45201-5480
(513) 354-6464 fax
ekybk@lsrlaw.com

2

| FORM B10 (Official Form 10) (12/08) | |
|---|---|
| United States Bankruptcy Court Eastern District of Kentucky | PROOF OF CLAIM |

| Name of Debtor:  Virginia T Boyd-Stephens | Case Number: 10-21301<br>Judge Wise |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor: (The person or other entity to whom the debtor owes money or property):<br>The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee by and through GMAC Mortgage, LLC its servicer<br><br><br><br>Name and address where notices should be sent:<br>GMAC Mortgage, LLC<br>1100 Virginia Drive<br>Fort Washington, PA 19034 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | |
|---|---|---|
| | | THIS SPACE IS FOR COURT USE ONLY |

| Account or number by which creditor identifies debtor:<br>Loan # XXXXXX1781 | Check here ☐ replaces<br>if this claim         a previously filed claim dated: _____<br>                         ☐ amends |
|---|---|

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☒ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. § 1114 (a)
☐ Wages, salaries, and compensation (fill out below)
Your SS #: ____ - ___ - ____

Unpaid compensation for services performed
from _____ to _____
(date)          (date)

**2. Date debt was incurred: March 24, 2006**

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:**       $142,491.52
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check box if claim includes interest or other charges in addition to the principal amount of the claim. Attached itemized statement of all interest or additional charges.

**5. Secured Claim.**
☒ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☒ Real Estate     ☐ Motor Vehicle
      ☐ Other _____

Value of Collateral:  $ <u>Unknown</u>

Amount of arrearage and other charges <u>at time case filed</u> included in secured claim, if any: $ <u>N/A</u>

Property Address: 53 Sylvan Drive  Independence, KY 41051

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $ _____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $11,725.00), *earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).
☐ Up to $2,600.00* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11. U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a) (___).
* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. Date-Stamped Copy:** To receive an acknowledgment of filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date: June 9, 2010 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any). | |
| | /s/ Rachel K. Pearson | |
| | Rachel K. Pearson | |
| | KY Bar Registration #91184 | |
| | (513) 241-3100 x-3309 | |
| | LERNER, SAMPSON & ROTHFUSS | |
| | Attorneys for Movant | |
| | PO Box 5480 | |
| | Cincinnati, OH 45201-5480 | |
| | (513) 354-6464 fax | |
| | ckybk@lsrlaw.com | |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

*Plus interest due from May 11, 2010 at 4.75% per annum.

Loan Number [REDACTED]                                                    MIN [REDACTED]

# NOTE

March 24, 2006                        CINCINNATI                        OHIO
[Date]                                [City]                            [State]

53 SYLVAN DRIVE
Independence, KY  41051
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 147,000.00          (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
The MoneyStation, Inc.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of                9.500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the      1st      day of each month beginning on        May 01, 2006         . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on         April 01, 2036         , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at 8604 Allisonville Rd Suite 101
Indianapolis, IN  46250                                      or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,236.06

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

VMP-5N (0207)                Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                    Initials: D.J.B
DDS-CN3

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of      15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

$$J.J.B.$$



**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
VIRGINIA  BOYD                            -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                            -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                            -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                            -Borrower                                                      -Borrower

*[Sign Original Only]*


-5N (0207)
DDS-CN3

Page 3 of 3

Form 3200 1/01

## ALLONGE TO THE PROMISSORY NOTE

Loan # █████████

Borrower (S):   VIRGINIA T. BOYD

Property:   53 SYLVAN DRIVE
            Independence, KY  41051

Loan amount: $ 147,000.00

Without Recourse, Pay to the Order of:

### RESIDENTIAL FUNDING CORPORATION

Its Successors And/Or Assigns As Their Interest May Appear.

From: **The MoneyStation, Inc.**

```
         BY:    [signature]
 Typed Name:           Phil B. Jolley
      Title:    VP /underwriting
```

V.T.B.

PAY TO THE ORDER OF
JP MORGAN CHASE BANK, AS TRUSTEE
WITHOUT RECOURSE
Residential Funding Corporation

By [signature] Judy Faber

Judy Faber, Vice President

**DDS-ALR**

Loan No ▮▮▮▮▮▮▮▮

THIS RIDER IS ATTACHED TO AND MADE A PART OF THAT CERTAIN
PROMISSORY NOTE FROM VIRGINIA T. BOYD TO THE MONEY STATION,
INC. THE PRINCIPAL AMOUNT OF $147,000.00

After 3 full years from the date hereof, maker may prepay in whole or in part,
without penalty, the then outstanding principal balance.  In the event maker prepays any
portion of the outstanding principal balance and accrued interest during the first 3 years
from the date hereof, maker shall pay in addition to such prepayment (or, as deducted
there from) a penalty in an amount equal to a percentage of the principal portion of the
amount so prepaid in accordance with the following:

> If paid during the first year from the date hereof, ONE (1.000) percent of
> the portion of such prepayment equal to the principal amount so prepaid.

> If paid during the second year from the date hereof, ONE (1.000) percent of
> the portion of such prepayment equal to the principal amount so prepaid.

> If paid during the third year from the date hereof, One (1.000) percent of
> the portion of such prepayment equal to the principal amount so prepaid.

Holder shall apply any prepayment first to reduce any interest and charges owing at the
time of such prepayment and then to reduce the amount principal owed under this note,
provided that such balance shall be applied to the principal in reverse order of the due
date of each payment and shall not otherwise affect or delay the due date of the next
payment provided under this Note.

Date:  MARCH 24, 2006

*Virginia T. Boyd*

VIRGINIA T. BOYD

# ALLONGE TO PROMISSORY NOTE

Date of Note:          March 24, 2006

LSR Number:          BK1004794

Maker of Note:       Virginia T. Boyd

Named payee:         The MoneyStation, Inc.

Amount of Note:      $147,000.00

The undersigned, acting on behalf of JPMorgan Chase Bank, as Trustee, hereby
transfers to, The Bank of New York Mellon Trust Company, National Association
fka The Bank of New York Trust Company, N.A. as successor to JPMorgan
Chase Bank N.A. as Trustee the Note and all right to payment of all balances
outstanding thereunder.

                              JPMorgan Chase Bank, as Trustee

                              By:    Sandy Broughton

                              Its:   Limited Signing Officer

I-1859 Pg 202

Return To:
The MoneyStation. Inc.
8604 Allisonville Rd Suite 101
Indianapolis, IN 46250
Prepared By:
The MoneyStation. Inc.
8604 Allisonville Rd Suite 101
Indianapolis, IN 46250

RETURN DOCUMENT TO
Merchant Title Services Agency, LLC
Suite O
7925 Paragon Road, Dayton, OH 45459

_Lisa Donohue agent_
Preparer    Lisa Donohue agent

Parcel # 032-30-02-070.00
Crap # FND 304-B

---

[Space Above This Line For Recording Data]

# MORTGAGE

Loan Number: ▮▮▮▮▮▮▮▮▮        MIN ▮▮▮▮▮▮▮▮▮

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 24, 2006
together with all Riders to this document.
(B) "Borrower" is
VIRGINIA BOYD,* A SINGLE WOMAN, AS HER SOLE AND SEPARATE SELF

*AKA Virginia T. Boyd

Borrower is the mortgagor under this Security Instrument.

KENTUCKY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Form 3018  1/01
(rev. 10/01)

-6A(KY) (0110)
Page 1 of 15        Initials: _J.J.B_

VMP MORTGAGE FORMS - (800)521-7291

DDS-KYU

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is
The MoneyStation, Inc.

Lender is a  .
organized and existing under the laws of INDIANA
Lender's address is 8604 Allisonville Rd Suite 101
Indianapolis, IN  46250

(E) "Note" means the promissory note signed by Borrower and dated March 24, 2006
The Note states that Borrower owes Lender One Hundred Forty-Seven Thousand   & 00/100

Dollars
(U.S. $ 147,000.00               ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than              April 01, 2036              . This Security Instrument secures 150% of the principal amount of the Note, but any amount secured in excess of the amount stated in the second sentence of this paragraph must be a "Protective Advance" as defined by Section 26 hereof (or, if the rate of interest is adjustable, may be interest added to principal, commonly called "negative amortization").

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

Initials: _JJB_

VMP ®-6A(KY) (0110)
DDS-KYU

Page 2 of 15

Form 3018   1/01 (rev. 10/01)

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the                        County                            [Type of Recording Jurisdiction]
of                              Kenton                               [Name of Recording Jurisdiction]:
SFR

Tax Parcel ID Number:032-30-02-070.00                    which currently has the address of
53 SYLVAN DRIVE                                                                      [Street]
Independence                                       [City], Kentucky      41051     [Zip Code]
("Property Address"):

  TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

  BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials: *J.J. B*

VMP -6A(KY) (0110)                      Page 3 of 16                     Form 3018    1/01 (rev. 10/01)
DDS-KYU

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow

Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the

work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to

these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security ·Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may· require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c)

certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon
an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic
Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby
shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not
apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in
the Note (together with this Security Instrument) can be sold one or more times without prior notice to
Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects
Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan
servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be
one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan
Servicer, Borrower will be given written notice of the change which will state the name and address of the
new Loan Servicer, the address to which payments should be made and any other information RESPA
requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is
serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations
to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not
assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an
individual litigant or the member of a class) that arises from the other party's actions pursuant to this
Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by
reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such
notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the
other party hereto a reasonable period after the giving of such notice to take corrective action. If
Applicable Law provides a time period which must elapse before certain action can be taken, that time
period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and
opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to
Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective
action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those
substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the
following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides
and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;
(b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that
relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response
action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental
Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental
Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous
Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do,
nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental
Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a
Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding
two sentences shall not apply to the presence, use, or storage on the Property of small quantities of
Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to
maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit
or other action by any governmental or regulatory agency or private party involving the Property and
any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any

Initials: _UTB_

Form 3018   1/01 (rev. 10/01)

Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

**25. Taxes and Assessments on Mortgage Insurance Premiums.** If mortgage insurance premiums are required to be paid by Borrower pursuant to Section 10, then in addition to such premiums, Borrower shall pay all taxes and assessments thereon for so long as Borrower is required by Lender to pay the premiums. All taxes and assessments on premiums due and payable by Borrower shall be considered an Escrow Item and shall be paid by Borrower to Lender in the manner provided for Escrow Items in Section 3.

**26. Protective Advances.** This Security Instrument secures not only the initial advance under the Note, but also all Protective Advances. "Protective Advances" mean any advances to maintain and protect the Property and/or protect Lender's rights in the Property made by Lender or by any sucessors or assigns of Lender, including, without limitation, any sums, with interest, advanced under Sections 5, 9, or 14 hereof: (a) to pay any Escrow Items; (b) to pay any sums secured by a lien or encumbrance on the Property without which payment the secured position of Lender, including the priority of this Security Instrument, or any successor or assign of Lender might be jeopardized; (c) to secure, repair, maintain, protect or preserve the Property, or Lender's interest in the Property and rights under this Security Instrument; or (d) to pay any and all expenses incident to the collection of the indebtedness secured by this Security Instrument and the foreclosure thereof by judicial proceedings, or otherwise, pursuant to Applicable Law, whether the Property is still owned by the Borrower or is owned by a Successor in Interest of Borrower.

To the extent that any Protective Advances are deemed to be "future advances" or "additional indebtedness" within the meaning of KRS 382.520, this Security Instrument secures such future advances or additional indebtedness, provided that the total indebtedness at any one time outstanding shall not exceed 150% of the original principal amount of the Note, with interest thereon, and whether or not

evidenced by notes, accounts or obligations of any kind whatsoever. It shall be a default under this Security Instrument if Borrower requests a release, in the manner provided by KRS 382.520, of any portion of the lien securing any of the additional indebtedness secured by this Security Instrument pursuant to KRS 382.520 prior to the date that all of the obligations secured by this Security Instrument have been paid and discharged and the Note and this Security Instrument have been terminated, and Borrower hereby waives any and all rights to request such a release to the maximum extent permitted by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _Virginia T. Boyd_____ (Seal)
                                                      -Borrower
                              VIRGINIA T. BOYD

_____     _____ (Seal)
                                                      -Borrower

_____ (Seal)      _____ (Seal)
            -Borrower                                 -Borrower

_____ (Seal)      _____ (Seal)
            -Borrower                                 -Borrower

_____ (Seal)      _____ (Seal)
            -Borrower                                 -Borrower

**STATE OF KENTUCKY,**      *Kenton*    County ss:

The foregoing instrument was acknowledged before me this *March 24, 2006*

by *Virginia T. Boyd, a single woman*

My Commission Expires:

*John T. Zeigler*

Notary Public



Notary Public
State of Kentucky
John T. Zeigler
My Commission Expires
8/18/2008

/1-1859Pg **217**

EXHIBIT "A"

LEGAL DESCRIPTION

SITUATED IN THE CITY OF INDEPENDENCE, COUNTY OF KENTON AND
COMMONWEALTH OF KENTUCKY, TO-WIT:

BEING ALL OF LOT NO. ONE HUNDRED NINETEEN (119) OF THE WOOD DALE
SUBDIVISION SECOND ADDITION AS SHOWN BY PLAT BOOK 12, PAGE 7 OF THE
KENTON COUNTY CLERK'S RECORDS AT INDEPENDENCE, KENTUCKY.

PARCEL NO.:032-30-02-070.00
GROUP NO.: IND 304-B

GMAC

# I-2692Pg110

LS&R No.: BK1004794
Group No.: IND 304-B
Pidn No.: 032-30-02-070.00

## ASSIGNMENT OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, **Mortgage Electronic Registration Systems, Inc. as nominee for The MoneyStation, Inc. its successors and assigns**, whose address is 3300 SW 34th Ave., Suite 101, Ocala, FL 34474, does hereby sell, assign, transfer and set over unto **The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee**, whose address is c/o 1100 Virginia Drive Fort Washington, PA 19034, a certain mortgage from Virginia Boyd aka Virginia T. Boyd, a single woman, as her sole and separate self, to Mortgage Electronic Registration Systems, Inc. as nominee for The MoneyStation, Inc. its successors and assigns, dated March 24, 2006, recorded on April 10, 2006, in Book I-1859, Page 202, in the office of the Kenton County Clerk, secured thereby and referred to therein; and all sums of money due and to become due thereon, and secured by the following real estate:

## Legal Description

SITUATED IN THE CITY OF INDEPENDENCE, COUNTY OF KENTON AND COMMONWEALTH OF KENTUCKY, TO-WIT:

BEING ALL OF LOT NO. ONE HUNDRED NINETEEN (119) OF THE WOOD DALE SUBDIVISION SECOND ADDITION AS SHOWN BY PLAT BOOK 12, PAGE 7 OF THE KENTON COUNTY CLERK'S RECORDS AT INDEPENDENCE, KENTUCKY.

PROPERTY ADDRESS:
53 Sylvan Drive Independence, KY 41051

Recorded
INDEPENDENCE
Doc type:
Book/page:
Doc#:
Dt/tm Recorded:
Total fees:
Clerk name:

RODNEY ELDRIDGE
KENTON COUNTY CLERK
ASSIGNMENT
I-2692/  110   2 pg
10 06 09 059 08093
06/09/2010   10:45:56am
13.00  Tax:    0.00
BONNIE L LOVE

**I-2692Pg111**

LS&R No.: BK1004794

IN WITNESS WHEREOF, Mortgage Electronic Registration Systems, Inc. as nominee for The MoneyStation, Inc. its successors and assigns, has set its hand this _25th_ day of _May_, 2010.

_L.S._

Mortgage Electronic Registration Systems, Inc.
as nominee for The MoneyStation, Inc. its
successors and assigns

By: _____
*Printed Name **Sandy Broughton**
*Title      **Assistant Secretary**

STATE OF _Pennsylvania_
SS.
COUNTY OF _Philadelphia_

On _May 29th 2010_ before me _Lisa Procopio_, Notary Public, State of _Pennsylvania_, personally appeared _Sandy Broughton_ _Assistant Secretary_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public
My Commission Expires: 7/31/13

This instrument was prepared by:

_____
R. Mark Rothfuss II
LERNER, SAMPSON & ROTHFUSS
A Legal Professional Association
PO Box 5480
Cincinnati, OH 45201-5480

NOTARIAL SEAL
LISA PROCOPIO
Notary Public
PHILADELPHIA CITY, PHILADELPHIA CITY
My Commission Expires Jul 31, 2013



Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

## CERTIFICATE

I, John C. Dugan, Comptroller of the Currency, do hereby certify that:

The Comptroller of the Currency, pursuant to Revised Statutes 324, et seq., as amended, 12 U.S.C. 1, et seq., as amended, has possession, custody and control of all records pertaining to the chartering, regulation and supervision of all National Banking Associations.

Effective July 1, 2008, the title of "The Bank of New York Trust Company, National Association," Los Angeles, California, (Charter No. 24526), was changed to "The Bank of New York Mellon Trust Company, National Association," Los Angeles, California, (Charter No. 24526).



IN TESTIMONY WHERE OF, I have hereunto subscribed my name and caused my seal of office to be affixed to these presents at the Treasury Department, in the City of Washington and District of Columbia, this January 14, 2009.

John C. Dugan

Comptroller of the Currency



Comptroller of the Currency
Administrator of National Banks

Northeastern District Office                                          Licensing Division
340 Madison Avenue, Fifth Floor                          Telephone No.: 212.790.4055
New York, New York 10173-0002                                   Fax No.: 301.333.7015

July 1, 2008

Eve Heimberg, Esq.
The Bank of New York Mellon
Legal Department
One Wall Street
New York, New York 10286

Re:   Change in Corporate Title
      The Bank of New York Trust Company, National Association ("Bank"), Los Angeles,
      California                                              Charter No.: 24526
      Control No.: 2008 NE 04 004

Dear Ms. Heimberg:

The Office of the Comptroller of the Currency ("OCC") has received your letter dated June 30,
2008, concerning the change and amendment to Article First of the above-referenced Bank's
Articles of Association. The OCC has amended its records to reflect that effective July 1, 2008,
the corporate title of The Bank of New York Trust Company, National Association, was changed
to "The Bank of New York Mellon Trust Company, National Association."

Sincerely,

J. Greg Parvin
Director for District Licensing

Enclosure



# INVOICE

Comptroller of the Currency
Administrator of National Banks

**Public Disclosure  (202) 874-4700**

---

**Customer Information:**
Michelle Leong, Legal Assist.
to Carlos S. Ramirez, Attorney At Law
Lerner, Sampson & Rothfuss
120 East Fourth Street, 8th Floor

Cincinnati          OH45202-4007

| | |
|---|---|
| **Invoice No.:** | **2009011** |
| **Date:** | **1/14/2009** |
| **ORG/Region:** | **7610** |
| **E-mail Address** | |

## PLEASE CITE INVOICE NUMBER ON ALL CORRESPONDENCE

| QUANTITY | DESCRIPTION | AMOUNT |
|---|---|---|
| 1 | **Certification No. 2008-1009**<br><br>The charges for providing the enclosed materials are computed as follows:<br>**Documents Certified:**<br>at $100 each.<br>**Duplicate Certifications:**<br>at $10.00 each.<br><br>Paid: **Yes**   Method of Payment **Check** | $100.00<br><br><br><br>$0.00 |
| | **TOTAL** | **$100.00** |

————ADDITIONAL REQUIRED INFORMATION————

Treasury regulations require organizations that do business with the federal government to provide us with a Taxpayer Information Number (TIN) This number may be a company's Employer Identification Number (EIN) or a person's Social Security Number (SSN). Under 31 USC 7701, this information may be used for the collection of any delinquent amount arising from doing business with the federal government.

**(513) 241-3100**
Contact Phone Number_____          TIN ____

For VISA or Mastercard:     Card Number: _____     Expiration
Date: _____

Signature: _____          Total Payment: _____

## See next page for VERY important information.

Make checks payable to the **Comptroller of the Currency**. Due on receipt -- to ensure proper credit complete the information above and return this invoice with your check. Be sure to keep a copy for your records. Mail payment to:

Form CC 6043-03

# Notice to Customers Making Payment by Check

***Authorization to Convert Your Check:*** If you send us a check to make your payment, your check will be converted into an electronic fund transfer. ``Electronic fund transfer'' is the term used to refer to the process in which we electronically instruct your financial institution to transfer funds from your account to our account, rather than processing your check. By sending your completed, signed check to us, you authorize us to copy your check and to use the account information from your check to make an electronic fund transfer from your account for the same amount as the check. If the electronic fund transfer cannot be processed for technical reasons, you authorize us to process the copy of your check.

***Insufficient Funds:*** The electronic fund transfer from your account will usually occur within 24 hours, which is faster than a check is normally processed. Therefore, make sure there are sufficient funds available in your checking account when you send us your check. If the electronic fund transfer cannot be completed because of insufficient funds, we may try to make the transfer up to two more times.

***Transaction Information:*** The electronic fund transfer from your account will be on the account statement you receive from your financial institution. However, the transfer may be in a different place on your statement than the place where your checks normally appear. For example, it may appear under ``other withdrawals'' or ``other transactions.'' You will not receive your original check back from your financial institution. For security reasons, we will destroy your original check, but we will keep a copy of the check for recordkeeping purposes.

***Your Rights:*** You should contact your financial institution immediately if you believe that the electronic fund transfer reported on your account statement was not properly authorized or is otherwise incorrect. Consumers have protections under a Federal law called the Electronic Fund Transfer Act for an unauthorized or incorrect electronic fund transfer.

Make checks payable to the **Comptroller of the Currency**. Due on receipt -- to ensure proper credit, complete the information above and return this invoice with your check. Be sure to keep a copy for your records. Mail payment to: **Comptroller of the Currency,** ATTN: Accounts Receivable, 250 E Street, S.W., Mailstop 4-8, Washington, DC 20219.

**R. Keith Fulwood**
Public Information Specialist
Communications Division
(202)874-5258
Fax: (202) 874-5274
Internet: keith.fulwood@occ.treas.gov

Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219